863 F.Supp. 1008 (1994)
Bettye WHITFIELD, Plaintiff,
v.
ST. LOUIS BOARD OF EDUCATION, Defendant.
No. 4:92CV1535-DJS.
United States District Court, E.D. Missouri, Eastern Division.
August 25, 1994.
*1009 Raymond Howard, St. Louis, MO, for plaintiff.
Kenneth C. Brostron, President, Michael T. Jamison, Lashly and Baer, St. Louis, MO, for defendant.

MEMORANDUM
STOHR, District Judge.
Plaintiff, a black female, is a Divisional Assistant in the Desegregation Monitoring Office of the St. Louis Public Schools. She brings this action pursuant to Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e et seq., alleging race and sex discrimination by her employer, as well as acts taken by the school district in retaliation for plaintiff's previous complaints concerning allegedly discriminatory practices. On February 14, 15 and 16, 1994, the case was tried to the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

Findings of Fact
1. Plaintiff has been employed by defendant since 1956, and has worked in the St. Louis Public Schools' Desegregation Monitoring Office ("DMO") since 1986. The DMO is a component of the desegregation plan previously adopted by another judge of this Court.
2. As a Divisional Assistant, plaintiffs duties include oversight of desegregation programs in non-integrated schools and monitoring of their compliance with the court-adopted desegregation plan.
3. At all times relevant to this action, Mr. Glenn Campbell, a white male, has been the Executive Director of the DMO, with supervisory authority over the Divisional Director of the DMO and the Divisional Director of the related office of Student Recruitment and Counseling ("SRC"), as well as all Divisional Assistants within those two offices.
4. Mr. Campbell began his employment with defendant in 1959, and has since that time worked in various capacities as a teacher, principal and administrator in the St. Louis Public Schools.
5. Mr. Campbell made the decision to hire plaintiff to join the DMO staff in 1986.
6. At all times relevant to this action, plaintiff performed her duties capably and well, and was so evaluated by Mr. Campbell in his annual evaluations of plaintiff's performance.
7. In 1989, Dr. Delores Longley, a black female, retired from the position of Divisional Director of the DMO.
8. Following Dr. Longley's retirement, Mr. Campbell moved Mr. Eugene Uram, formerly Divisional Director of SRC, to the position of Divisional Director of the DMO. *1010 Mr. Campbell selected Mr. Harlan Lewis, formerly a school principal, for the position of Divisional Director of SRC. Mr. Uram and Mr. Lewis are white.
9. These personnel changes were prompted in part by concerns of the district's superintendent, Dr. Jerome Jones, who indicated to Mr. Campbell that he had received complaints concerning Mr. Uram's supervision of magnet school programs and had heard rumors that Mr. Uram had an alcohol problem.
10. Mr. Campbell's investigation did not substantiate the reports which had given rise to the superintendent's concerns, but the superintendent nonetheless indicated his desire to remove Uram from the position. Mr. Campbell satisfied the superintendent by agreeing, in late spring or early summer of 1989, to move Uram to the directorship of DMO following Dr. Longley's retirement.
11. The vacancy created by Dr. Longley's retirement was filled without any announcement of and competition for the position. The vacancy at SRC needed to be filled quickly to allow SRC to meet the schedule imposed for developing the magnet school lottery, which was to be used for the first time in the imminent 1989-90 school year.
12. At that time, Harlan Lewis held an administrative position which was to be eliminated in a reorganization. He had experience as a principal and in relation to the magnet schools.
13. Mr. Campbell approached Mr. Lewis about the SRC vacancy, and Superintendent Jones approved Lewis' selection for the position.
14. In approving the personnel changes involving Mr. Uram and Mr. Lewis, Superintendent Jones, who is black, was aware that both Uram and Lewis are white.
15. In July, 1989, shortly after the announcement of these personnel changes, plaintiff sent a letter to the Honorable Stephen N. Limbaugh, the United States District Judge then presiding over the litigation involving the desegregation of the St. Louis Public Schools. In the letter, plaintiff expressed her criticism of the personnel changes which resulted in the three most senior desegregation-related positions in the school district being held by white males.
16. Plaintiff sent copies of the letter to Dr. Joyce Thomas, president of the school board, and the board's vice-president, Rev. Earl Nance, and secretary, Gwen Moore.
17. After receiving plaintiff's letter, Dr. Thomas contacted plaintiff by telephone and indicated that the Board did not become involved in personnel matters.
18. Sometime in 1989, Mr. Campbell received a telephone call in which the caller informed him that a member of his staff had complained about the personnel changes involving Uram and Lewis.
19. At trial, Mr. Campbell testified that he could not remember who the caller was. He further testified that he had interpreted the call as indicating that the complaint had been about the process used rather than race or sex discrimination, and that he did not personally take offense at the substance of the reported complaints because the personnel changes had been initiated by Superintendent Jones rather than himself.
20. Although the evidence suggested that Mr. Campbell ultimately was aware that it was plaintiff who had complained, the evidence was unclear as to whether the caller identified the complainant as plaintiff, or whether Mr. Campbell learned it at some later time.
21. Mr. Campbell never saw plaintiff's letter to Judge Limbaugh prior to plaintiff's filing charges of discrimination and retaliation.
22. In October, 1990, a Vacancy Announcement was posted for the position of Divisional Director of SRC, when Mr. Lewis returned to his former position, which had been restored.
23. The announcement prepared by the school district's personnel department contained the following language:
Qualification Requirements:
Master's degree in education, counseling or administration; minimum of three years of successful administrative experience; and strong organizational, administrative and interpersonal relations skills.
*1011 24. Plaintiff applied for the position.
25. Plaintiff has received a Master's degree in education, as well as a "specialist's degree" in education and a doctorate in educational administration; all three degrees were reflected in the materials submitted by plaintiff in support of her application.
26. The subject of plaintiff's doctoral dissertation was the St. Louis desegregation controversy. The dissertation was based on plaintiff's research of nine of the twenty-three school districts involved in the St. Louis desegregation plan.
27. At the time of her application, plaintiff had four years' experience in the DMO and more than twenty years' employment with the defendant.
28. Mr. Campbell and Mr. Lewis reviewed all fifty-two applications pre-screened for the SRC position which Lewis was vacating. They selected ten candidates and submitted their names to Frank Cooper, one of four Directors of Selection and Placement with the district's personnel department. Plaintiff's name was among these ten.
29. After Mr. Cooper directed that the number be reduced to five for interviews, Mr. Campbell eliminated plaintiff and four other candidates from the list of names.
30. In reducing the ten names to five, Mr. Campbell chose the five candidates who had what he considered the most demanding "line" administrative experience and greatest knowledge of SRC.
31. The five candidates selected for interviews were Chester Edmonds, a black male, Mildred Anderson, a black female, Curtis Doyle, a white male, Charles Fitzgerald, a white male, and Dannie Franklin, a black male.
32. All five candidates had more substantial "line" administrative and supervisory experience than plaintiff; several had superior knowledge of the workings of SRC.
33. Mr. Franklin was later disqualified from consideration because his Master's and doctoral degrees were received from a university which was not considered to be properly accredited. Mr. Franklin was not interviewed for the SRC vacancy; only the remaining four candidates were interviewed.
34. Mr. Campbell was asked to select several other individuals who, along with himself and Mr. Cooper, would make up the interviewing panel.
35. The interview panel was composed of Mr. Campbell, Mr. Lewis, Mr. Uram, Al Vaughn, a black male Divisional Assistant who reported to Mr. Campbell, and Mr. Cooper, a black male.
36. Mr. Campbell chose Mr. Lewis, Mr. Vaughn and Mr. Uram for the interview panel because he considered them the people whose knowledge of SRC best equipped them to judge who would be successful as the Divisional Director of SRC. Lewis and Uram had both held the position, and Vaughn was the DMO Divisional Assistant who had monitored SRC for legal compliance for approximately five years.
37. The Divisional Director of SRC supervises a staff of approximately 12 full-time personnel plus approximately six to twelve part-time parent volunteers.
38. The SRC office responds to approximately 30,000 telephone inquiries and 27,000 pieces of mail annually, processes between 9,000 and 10,000 magnet school applications each year, and has more than 16,000 unscheduled visits from students and parents.
39. An important component of the duties of the director of SRC is contact with students and parents, for example, in connection with the lottery system used to determine assignments to the city's magnet schools.
40. Chester Edmonds, a former student of plaintiffs, was selected to fill the vacant directorship of SRC.
41. Mr. Edmonds was advanced as a candidate and ultimately chosen for the job chiefly due to his twenty years' experience as a school principal. This type of "line" administrative experience, involving responsibility for and supervision of an entire operation and staff, was considered by Mr. Campbell to be superior to plaintiff's "staff" administrative experience, in which she performed administrative duties as one of a staff of administrators and had little or no supervisory *1012 authority or responsibility for operations beyond her own.
42. Mr. Edmonds also received the highest interview scores of the candidates interviewed. Each member of the interview panel evaluated each candidate based on eight criteria. No other candidate received a total score as high as 30 from any member of the panel; all five panel members gave Mr. Edmonds total scores greater than 30.
43. As a long-time school principal, Edmonds had considerably more experience, and more recent experience, than plaintiff in regular contact with students and parents.
44. Following Edmonds' selection for the directorship of SRC, plaintiff filed with the Equal Employment Opportunity Commission a charge of race and sex discrimination and retaliation concerning her non-selection for the vacancy.
45. A right to sue letter was issued by the EEOC on May 4, 1992.

Conclusions of Law
At the close of plaintiffs evidence, defendant moved for judgment as a matter of law, in part on the basis of its contention that plaintiffs charge of discrimination was not timely filed with the EEOC and/or was not verified in conformity with statutory requirements. The letter advising plaintiff of her non-selection for the SRC vacancy was dated October 23, 1990, and her charge was submitted to the Missouri Commission on Human Rights on November 15, 1990, well in time to meet the requirement of § 2000e-5(c) and (e). The Court also notes that plaintiff timely filed her complaint on August 3, 1992, within ninety days of her May 7, 1992 receipt of the right to sue letter issued by the EEOC on May 4.
The charge shows plaintiffs signatures in two blanks on the form. One appears to be for use with notarization, but the form was not in fact notarized. Plaintiff also signed separately beneath the following language printed on the form: "I declare under penalty of perjury that the foregoing is true and correct." The Court concludes that this signature constitutes the verification necessary for the filing of the charge, and distinguishes this case from those relied upon by defendant, Hodges v. Northwest Airlines, Inc., 990 F.2d 1030 (8th Cir.1993) and EEOC v. Appalachian Power, 568 F.2d 354 (4th Cir.1978). Defendant's arguments are therefore rejected.
Title VII defines and prohibits certain unlawful employment practices. Included among these is discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." § 2000e-2(a)(1). Title VII also prohibits an employer from discriminating against any employee "because he has opposed any practice made an unlawful employment practice by this subchapter." § 2000e-3(a). As numerous decisions recognize, however, an employer has the right to make business decisions concerning hiring, termination, work assignments, promotion and employee discipline "for good reason, bad reason, or no reason at all, absent intentional ... discrimination" or retaliation for protected activity. Walker v. AT & T Technologies, 995 F.2d 846, 848 (8th Cir. 1993).
As the Court's findings of fact indicate, although plaintiff establishes a prima facie case, plaintiff fails ultimately to demonstrate that race, sex or retaliation was a motivating factor in the employment decisions of which she complains. Plaintiff makes much of the definitions of "length and character of service" as used in the school board's Regulation # R4237.5, which provides that "[a]ll promotions of employees shall be made upon the basis of length and character of service." Plaintiff urges a mechanical application of these factors in the selection of personnel for promotion, which the Court does not believe is required by either the regulation itself or the laws prohibiting race- or sex-based discrimination in employment.
The Court is unpersuaded that the regulation upon which plaintiff so heavily relies is intended to apply to the filling of vacancies such as that here at issue. Dr. Charlene Jones, Associate Superintendent for Personnel, testified at trial that the regulation would not apply to the hiring of a replacement *1013 director for SRC, because the vacancy announcement was advertised so as to attract "outside" applicants not then employed by defendant, to whom the regulation's "length of service" criterion would not apply. Furthermore, Dr. Jones indicated that the type of "promotions" governed by the regulation are those involving an increase in grade and pay along a scale, such as a move from Secretary II to Secretary III or from Custodian I to Custodian II.
Even assuming the regulation does apply in this case, the failure to comply with it would not, in and of itself, constitute a violation of Title VII. In any event, the Court ultimately concludes that the "character of service" factor, which in the Court's view includes the nature, scope and complexity of a candidate's prior service, was the key factor in the determination to eliminate plaintiff from consideration and the decision to offer the SRC position to Chester Edmonds. The evidence suggests that plaintiff performed her job well and was appropriately evaluated for her level of success, but that her background was not considered optimal preparation for the directorship of SRC.
As indicated in the Court's findings of fact, Chester Edmonds was selected to become Divisional Director of SRC primarily because of his substantial and successful history as a school principal and his highly successful interview for the position, both of which suggested to Glenn Campbell and the other members of the interviewing panel that Edmonds possessed the skills and abilities necessary to supervise the SRC office and operation. The Court finds that defendant's proffered non-discriminatory explanation of the non-selection of plaintiff and the advancement of other candidates instead, as well as its explanation of the ultimate selection of Chester Edmonds, are not pretextual. This finding rebuts the presumption of discrimination raised by the prima facie case. See Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 801 (8th Cir.1994).
As fact-finder, the Court is not persuaded that plaintiff's race or sex, or retaliation for plaintiffs past complaints about race or sex discrimination, played any role whatsoever in her non-selection for the position. If the Court were to analyze the case as involving mixed motives, which analysis the Court believes is not appropriate on the facts found, the Court would nonetheless conclude that plaintiff would not have been selected for the SRC vacancy even in the absence of any discriminatory or retaliatory motive on the part of the decision-makers.

Conclusion
Based on the foregoing findings of fact and conclusions of law, the Court determines that plaintiff has failed to meet her ultimate burden of persuading the Court that she was the victim of retaliation or discrimination on the basis of sex or race. Instead, the Court concludes that plaintiff was not selected for promotion to the directorship of SRC because she was not considered as well qualified as the five "finalists" and especially the ultimately successful candidate. Defendant is therefore entitled to judgment in its favor. A judgment in conformity herewith will be entered this day.